If it pleases the court, good morning. My name's Richard Cornell. I represent the appellant, Richard Pruitt. We're here on appeal after denial of a 2254 petition where this court has certified two issues, a confrontation clause issue and an ineffective assistance of counsel issue. Both are exhausted and not procedurally defaulted, so they're analyzed under 20 U.S.C. 2254 sub D. And it's my burden to show an unreasonable application of Strickland vis-a-vis the second issue and an unreasonable application of Davis, Van Arsdal, Olden, Michigan v. Lucas, that host of cases vis-a-vis the confrontation clause issue. And what I'd like to do, if I may, is discuss the second issue first, because to me, I think it's a cleaner issue and I think it's a more precedent governed post-EDPA issue. But both issues have a common framework. First off, when you look at the facts of this case, especially as of late amount of pages 5 through 20 of the blue brief, you have to conclude this case rests exclusively on a credible Christina. There's no scientific evidence, no DNA, no recipient witnesses. Without a credible Christina, Nevada had no case against my client. Secondly, for both issues, you have to look at counsel's theory of the case. And you see that at ER volume 7, 2027 through 31. The theory of the case is that the charges were false and that the reason Christina fabricated the charges was to retaliate against her father, the appellant, for his discipline in not allowing her to have further contact with her then boyfriend, Chuck. Counsel, do you have a problem, a chronological problem? I remember reading the record with that last argument. If I remember the record correctly, there was a charge in 1990 that Christina had been subjected by her father to a sex act reported to Christina's friend, who testified, and the friend testified that she had heard from Christina about that in 1991. The evidence further shows that Christina met Chuck, the boyfriend her father objected to, at the end of her eighth grade year in August of 1992. It'd be very difficult for me to accept the proposition that Christina was retaliating against the father's prohibition of her seeing Chuck when she complained about the unnatural act taking place two years before she met Chuck. All right. And it's an inconvenient fact. Perhaps you could deal with it. Usually, appellants in my position come here with inconvenient facts. I agree with that. Let's examine the time frame. The appellant gets post-divorce custody of Christina in 91. The incident that you reference happens in 92. No, no. There are three incidents I've referenced. Right. There are two in 90. One, the complaint by Christina to her girlfriend in 1990. No, in 1991, about an act that took place in 1990. Right. And then, in 1992, along comes Chuck. Right, Chuck comes slightly afterwards. I agree. All right, if that happens, then how can you say that it was all cooked up by Christina to protest the retaliation against Chuck when she'd already complained before she even knew Chuck? Right. This is why I started with the IAC issue first. Because the question is, how did counsel prove the theory of the case, which is what I just stated? What he did was he proved inconsistent statements by Christina beforehand, albeit to adults, to prove factual inconsistencies on whether Christina actually was telling the truth or made it up at any time. But he really didn't present evidence to prove why she would make false allegations in 1993. And he wanted to, but could not prove that Christina had a source of sexual knowledge alternate to my client because of the rape shield ruling. What counsel did was he made the decision not to investigate. And specifically, not to investigate the appellant's acquaintances from the Baptist Church. The appellant's wife gave counsel a list of witnesses to investigate that included Roberta Lampkin, Joyce Silva, and Megan Higgins, all of whom were on counsel's formal witness list to the trial court. They chose not to investigate anyone. They chose to limit their investigation. They're stuck with what those witnesses would have said. All three of them testified at the post-conviction hearing. Roberta Lampkin's testimony is at ERV 7, 1854 through 57. In 1992, when these rumors of sex abuse were going on, Ms. Lampkin confronted Christina. Christina denied them and said simply that she wished her father would look at her more as a woman at age 13 than as a child. When I showed Ms. Lampkin's affidavit to counsel, he admitted that that was consistent with his theory of the case, and he would have wanted to use that if he knew about it. Ms. Silva's testimony is found at ERV 7, 1910 through 1912. In 1993, or approximately two months prior to the arrest in this case, which happened in October of 93, Christina said she was going to get back at her father, the appellant, my client, for not letting her go out with her boyfriend. That was referencing Chuck. Counsel admitted when I showed him the affidavit of Ms. Silva that that was consistent with his theory of the case. I submit to you that when you look at the trial transcript, you will conclude nowhere in the trial transcript is that kind of motive of evidence presented. That's true, but the list that counsel got didn't give any hint that they know this. All it said was it was given by your client's wife, as I recall. Correct. And all she said was, these people know the daughter and my husband. That was it. And how many were on the list? Quite a few. All of the people in all of their relationships. And is it your position that he should have gone and talked to each one of these people, or he has violated the? Absolutely. Absolutely. Yes, because of the nature of this case. If you could tell me how many are on the list, it would be easier. If there are only three on the list, I could buy into that argument. Whatever number appear at ER 555 through 58, however many that adds up to. More than three, I can see. But for every IAC case that I've cited, to me the one that jumps out is Easy versus Senkoski, the Second Circuit case. And here's why. This, in my opinion, of non-capital criminal litigation, is the most difficult kind of case to defend. You have the word of a child, and that's it. And you know going in that the jury's going to want to believe that child. If you are given information of people to investigate who may know something to controvert that child's word, you have to do it. You have to interview those people. That's the key to the case. But there's no one that said that they may know. All that was said was they know them. That is, they could have been somebody they met in a show one night. It isn't – it hasn't gone that far that reasonable counsel would go out and talk to each one of these people. These were people all went to church on a weekly basis with this family. I mean, they certainly weren't that casual of acquaintances. But didn't defense counsel put on lots and lots of evidence of retaliation and fabrication? Wouldn't the evidence offered by Ms. Higgins, Lampkin and Silva just have been cumulative? I do not believe so. First off, I – again, I looked at the trial transcript this weekend to make sure I was accurate on this. Evidence – there were two missing elements to the defense at trial. One, evidence of retaliation, not there. Two, evidence of Christina's sexual knowledge from sources other than her father, not there. Those two elements which were absolutely – absolutely required for this defense simply were not there. What was there was a lot of inconsistent statements on whether it happened or not. But those inconsistent statements were made to adults where the prosecution could explain, oh, she was in an intimidating fashion with the adults and said what they wanted to hear. That leads to Megan Higgins. Her testimony is at ER Volume 7, 1849 to 51. She was a contemporary of Christina's and in the church parking lot in 92. At the time, the uncharged allegations were going around. She said, my dad's innocent. My dad would never do a thing like that. Well, she later was to claim that dad did it twice in September of 90s. So that statement clearly is inconsistent to what she later claimed. But she was not in any way intimidated when she made that statement. She made it freely and voluntarily. And a reasonable jury could have given Ms. Higgins' testimony an awful lot more weight than the inconsistent statements that she made to adults. As I see it, and to answer Judge Wallace's question, I question whether this is really that different than Lord v. Wood and Hart v. Gomez. Lord v. Wood is the one where the defense presented the alibi defense and presented an alibi witness but chose not to investigate and didn't realize he had three others. And the jury didn't hear from them. And this court ultimately reversed the denial of habeas there. And to me, that case is awfully persuasive authority for what this panel respectfully should do. Now, the Confrontation Clause issue, if I may, presents a little bit different of an issue. The problem there is trial counsel is cut off at the knees. What he wanted to show is that when a client learned of the sexual contact between his daughter and the boyfriend, that he confronted the boyfriend, or confronted the daughter, disciplined the daughter, and then right after that the daughter filed these charges in the autumn of 93, the problem was he wasn't allowed to get into any of the details at all under the rape shield law. The daughter testified at trial that dad accused me of this and cut me off from my boyfriend, Chuck, altogether. But what was missing was whether the accusation was true or false. What would have come out at trial is she admitted it and then he imposed discipline. By keeping that out under rape shield, it made it sound like my client was acting very unreasonably and gave the jury another reason to frown at my client and ultimately convict him. As far as motive to lie goes, per Davis, Olden, and the cases I've cited, especially Lewis v. Wilkinson, you can't construe the rape shield statute to keep this out under the confrontation clause. The question is, evidence relevant to motive to lie, the question there is when. And liminally, to me, obviously, motive to lie when the charges are made. So all of this that happened prior to October of 93, whether real or imagined, precedes that date to create a rule of law that the contact, the independent knowledge has to happen before the child claims that the defendant sexually abused her gives the license, essentially, the child to concoct a story that goes back about as far as her memory goes. And there's no authority that I've found anywhere that supports that. I will be candid with you. The real problem that I have in this case is the cat was out of the bag at the post-conviction hearing by virtue of Carrie Griffin's testimony. I think at this point, there's no real doubt that this child had sexual knowledge from sources other than the appellant. I can't really call Carrie Griffin a witness that counsel should have known. She wasn't on the list. She was Roberta Lampkin's daughter. She was easily findable, as I found her. I'm having a hard time saying, well, counsel should have known based on the list, although maybe I concede too much. I don't know. But at the same hand, we have, when we review this record for prejudice, I submit we have to take all of the evidence that was established at the post-conviction hearing as well as the trial. And what I would respectfully urge this court to do is to reverse on the ineffective assistance of counsel issue, but also reach the merits of the Confrontation Clause issue and give the Nevada courts guidance in the event of a retrial. Thank you. May it please the court and counsel, my name is Robert Whelan. I'm a senior deputy attorney general employed by the Office of the Attorney General of the State of Nevada. I have the privilege of representing the respondents in this matter. As your Honor pointed out, Mr. Cornell and his client have a chronological problem in this particular case, and quite frankly, it simply cannot be overcome. The allegations regarding the sexual assault were alleged to have occurred in 1990. The victim in this case confided that to her friend, Tamara Mathis, in 1991. She didn't even meet her boyfriend until 1992, and it wasn't until 1993 that formal charges were brought against the defendant. In this particular case, the trial court determined that it would not allow evidence of the victim's sexual conduct, if there was any, with her boyfriend. That was the defense motion. The defense wanted to present, and in fact did present, a defense that the allegations were fabricated. The problem is, is that, as the court noted, the victim had already confided prior to the time she met her boyfriend and prior to the... But what about the point that was made by counsel that motive at the time the charges are made, in 1993, is what's important? And at that point, if the evidence were that the father found out about the sexual relationships with Chuck and prohibited her from seeing Chuck, her motive in making the charges, even though she'd made prior allegations or prior statements in 1990, the motive at the time she made the charges was important to show to the jury. Well, first of all, that does not negate the fact that she told Tamara in 1991, whatever her motive was in 1993. Let's assume that she's all mad at her dad because she's, her dad has found out or supposedly found out. The jury can weigh, and the jury did weigh, but what the jury didn't weigh was that she was having sexual relations with Chuck in 1993. The father found out about it, told her she can't, she couldn't see Chuck anymore, and then she made the charges. All right. That has nothing to do with her credibility with respect to what she told Tamara in 1991. But it has something to do with the credibility when she made the charges. Has nothing, okay. Even if you assume that, and I respectfully disagree, that that has any bearing on her credibility with respect to what happened in 1990. It has no bearing on Tamara Mathis' credibility, and Tamara Mathis testified that Tamara, or that the victim in this case, told me in 1991 that her father had sexually abused her. So even if, even with your line of thought, Your Honor, even if you were to accept that, there is still the uncontroverted evidence of Tamara Mathis that in 1991 the victim told me that her father had sex on her. So the evidence is still going to stand, and even more so. I mean, there was evidence about how disappointed the victim was with her father's conduct in restricting her. If you'll recall, the transcript shows that her boyfriend, Chuck Rehdorf, went to Pastor Peterson, and Pastor Peterson described how angry Chuck was at the whole thing. And in fact, there was testimony about the blow up when the victim's father, Mr. Pruitt, demanded that Chuck come over and confront him about that. And then he demanded, according to the testimony, that the victim deny that anything happened, which the victim did. In the presence of her boyfriend there and apparently the family at that point in time. When the victim denied the existence of any sexual relationship with Chuck, didn't that- No, no, no, no, excuse me. She denied any allegation of a sexual relationship with her father. With her father. But she also said that in her testimony that people said that I'd had a relationship with Chuck, and wouldn't that imply that she hadn't had a relationship with Chuck? I don't know that it applies one thing over the other. If it implied, I mean, people say I've done something. It's not really an admission that I've done something. It's sort of an indication that I didn't do it. And people say that. If that were implied, wouldn't that be a waiver of the rape shield? Because she's talking about not having had sexual relationships. The point is, in this particular case, the court determined that it was irrelevant. And in fact, it is. That she's having sexual relationships with Chuck is irrelevant to- Is that what the Supreme Court said? I thought the Supreme Court said it was- It was cumulative. Well, the whole- Harassing, I think they- I beg your pardon, Your Honor? I think they agreed with the lower court that it was harassing. Well, yes, because the point is, is that you- Well, that's different from cumulative. The point is that, I beg your pardon, Your Honor? It's different from cumulative. Well, it is harassing because it has no bearing, in fact, on her credibility. And in this particular case, even if you think that it did, the error is harmless because of the corroborative testimony of Tamara Mathis. Well, the Supreme Court of Nevada chose to affirm this case, and that's the last opinion, so that's the one that we look at in habeas corpus. They decided that the rape shield should be imposed because they agreed with the trial court that it was harassing to the alleged victim. And so that has to be, whether or not the rape shield was properly handled, has to be determined based upon that analysis made by the Supreme Court. So it seems to me that if you're going to defend the use of the rape shield to prevent questions to the victim about her sexual relations with her boyfriend, it has to be on the basis that it was harassing. That's what the Supreme Court decided. So how was the Supreme Court agreed to the trial court that it would be harassing of the witness? How is it, of course, every cross-examination is a certain amount of harassing, but how is it harassing such that the rape shield should be applied? Well, I think you can use harassing in a variety of different meanings, Your Honor. And I think it's harassing because it, in fact, as I've said and I maintain, it has no bearing, number one, on her credibility. It has no bearing on whether or not by virtue of the time frame that was pointed out. The fact that in 1990, the sex acts are alleged to have occurred. 1991, she tells Tamara Mathis what happened. 1992 is when she starts seeing her boyfriend. Who knows, first of all, when or if they had sexual relations. There isn't anybody more to the point, I guess. You're saying it wouldn't make any difference. It would come out that way. But what the Supreme Court did, whether they did it correctly or not, was take away a good part of the defendant's case, that he was going to point out that there was this sexual conduct. And it was all made up based upon her experiences with Chuck, and that she was retaliating against the father with her testimony because of what she did. I mean, whether it sold or not, that's a different point. The point is that it never got to the salespeople. Well, the thing about it is, as well, Your Honor, is that with respect to that, he's able to put the motivation for her fabrication in front of the court anyway. He broke up my relationship with my boyfriend. They don't have to go in, broke it up because I was having sex with him. The strength of the relationship- Beg your pardon, Your Honor? The strength of the relationship is in direct relation to the strength of the motivation. If they were having sexual relations, one would expect that the strength of the motivation is to retaliate when she's not allowed to see the boy. It's stronger than if they were just holding hands at the Baptist church. So the real- I'm not sure I necessarily agree with that, but- You don't? You don't? Pardon me, maybe you go to Baptist churches and I don't. But the real issue is whether the Supreme Court made an unreasonable application of United States Supreme Court law in holding that the shield applied here. That was the issue. Now, in what way would you argue that this was not an unreasonable application of Supreme Court law? As I said, Your Honor, the chronological aspect of this thing, the fact that- I understand that, you said that. That's not my question. I think that's- My question is different on a legal basis. The question is, how would you argue that what the Supreme Court ruled was not an unreasonable application of United States Supreme Court cases? Okay, first of all, with respect to this, he was able to present evidence of the bias, the motivation. By virtue of the fact that it's uncontradicted, as a matter of fact, the records replete with reference about how the father broke up the relationship. I understand that argument. You trust it. The issue is, what cases do you rely upon that this is not an unreasonable application of Supreme Court law? I'd rely on Harrington v. Richter. I'd rely on Kerry v. Moosledine. And I'd rely on Williams v. Taylor because there is no- What's the strongest case? Take your pick. You want all three. The petitioner has the burden of showing an unreasonable application, not us showing that it is reasonable. And there is, under Kerry v. Moosledine and under Williams v. Taylor, there is no United States Supreme Court case that says that with respect- There is no United States Supreme Court with materially indistinguishable facts that demonstrates that the Nevada Supreme Court's resolution of this issue was contrary to an unreasonable application of clearly established federal law. Okay. With respect to the claims of ineffective assistance of counsel, with respect to Joyce Silva, that, again, as I pointed out, the testimony that elicited at the post-conviction proceeding, that she was apparently going to get back to the father at the father. I've already argued that with respect. And, again, that's corroborated by the fact that Pastor Peterson talked about how angry Chuck was at the defendant. That appears to excerpt the record 738. There was already testimony with respect to how the difficult relationship the victim had with the defendant at 1136, notwithstanding the fact that she loved her father. With respect to Roberta Lampkin, the testimony that Roberta Lampkin supposedly was going to offer was the fact that she denied, that the victim denied her father sexually abused her. Again, the victim repeatedly had denied, in certain extent, denied that her father had abused her until things came to a head in 1993. Could I go back to the ineffective assistance of counsel? Because the question is whether he should have proceeded and called these witnesses. As I was reading the transcript, it seemed to me the government was portraying Christina as sexually innocent. Why, then, wouldn't the evidence about Christina's activities with Chuck be relevant? Because the activities with Chuck occurred somewhere after 1992 and 1993, and the victim's allegations against the defendant were alleged to have occurred in 1990. So, if she supposedly got knowledge from Chuck about whatever, that doesn't show, particularly given the corroboration to Tamara Mathis, about what has no bearing on what happened in 1990. Well, then, if counsel had proceeded down the witness list, when he didn't hear from some witnesses what he wanted for his case, shouldn't counsel have proceeded along the witness list and then attempted to introduce the evidence that was excluded here as cumulative? Well, I guess you could make an argument that because they lived in a small community and he went to this church, he should have talked to everybody. But that's just not the way it works. Counsel's conduct was reasonable in the first instance. And, secondly, even if he were to introduce these allegations or have this testimony that these people supposedly might have offered, some of which is, in fact, most of which is, in fact, denied by the victim in this case, and none of which is actually established as a fact. I mean, what happened, Mr. Cornell is talking about evidence that was presented at the evidentiary hearing, but there were no factual findings that this is exactly what they would have testified to or credibility one way or the other on it. Well, in contrast to the Chuck evidence, the Higgins, Lampkin, and Silva evidence would not have been after. It would have been contemporaneous, would it not? Well, with respect to Megan Higgins, that's alleged to have occurred supposedly in September of 92, which would have been after Tamara's, the conversation with Tamara. Moreover, the victim denied that she, well, she said she didn't remember talking to Megan, but she wouldn't have talked with Megan about that in any event. So I take that as a denial with respect to the Roberta Lampkin. The victim supposedly said she wished her father would be more lenient with her. The point is what teenager doesn't say that? And, in fact, she denied making the other statement. Okay. I understand. I see your time is up. But before you leave, I have a question. What your argument has been is one that we would hear ordinarily on a direct appeal, that this is the habeas appeal. And once more, the issue is not before us of how this case should have come out, but whether or not there was an unreasonable application of Supreme Court law. In dealing with the second issue, that is, whether or not the conduct of the attorney fell below the set guidelines of Strickland, how would you argue that it's not an unreasonable application of United States Supreme Court case? Would you rely on Strickland? Or are there other cases that you would rely on as to the unreasonable application issue, which is the one we have to decide? Well, Strickland is the clearly established federal law in this particular case. And in Harrington, the United States Supreme Court talked about the double deference that needs to be applied. That's been talked about in other cases in this court. But in a combination of Strickland and Harrington, and the fact that in Respondent's opinion, he can't demonstrate prejudice, and the fact that he can't demonstrate that, and the double deference that's afforded the Nevada Supreme Court's resolution of the issue, it's Respondent's position, of course, that he cannot prevail and he is not entitled to Federal abuse relief. Okay. Thank you. Thank you. Mr. Cornell, this is on our time. You've still got a minute to say. Okay. My notes indicate that what you're saying is that the ineffective assistance of counsel was in the failure to produce Higgins, Lamkin and Silva, and that what was the evidence that had Higgins been called would have made a big difference? Thank you. I was going to address that. Two points. Number one, as Your Honor indicated, Tamara Mathis, in the big scheme of things, becomes an important witness because Christina makes this prior consistent statement. But in the same time frame, she makes the inconsistent statement freely and voluntarily to Megan, also a contemporary, also makes the inconsistent statement and explains why she's making the inconsistent statement to Roberta, also in the same time frame. What you're saying by inconsistent statement is I didn't have relations with my father. Correct. And also, don't forget, too, the investigator in this case, Pat Gertz, testified at the hearing that it would have been a good idea to interview the members of the Baptist Church. Why didn't he do it? He gave the clue. He thought this case was so outlandish that no one would believe it. He limited it to the prior inconsistent statements to the adults and also the orthodontia testimony. And to be candid with you, when I read the orthodontia testimony, I said, oh, my gosh, how could anybody believe this? Well, you know, 12 people in Lyon County did. That's the bottom line. He didn't go far enough. And that gets us to the key question. Your point is that Higgins, Lankin, and Silva, had they testified, would all have put the lie to the idea that Christina had sex with her father. Yes. That the statement simply is false, as well as the testimony. Now, with respect to the Confrontation Clause, if I may, I know I'm out of time, if I can indulge you just quickly. The standard that this Court applies, answering Judge Wallace's concern, is straight from Van Arsdal. It is a general standard, much as Strickland is a general standard. It's not a fact-specific standard. I mentioned Lewis v. Wilkinson, and in a sense, the circuit authority that's even more apropos, Holly v. Yarbrough, which Judge Milo Smith and that panel decided in 2009. Unfortunately, not on the Supreme Court. Well, unfortunately, not on the Supreme Court. But I think an accurate view of Supreme Court authority that has not changed since 2009. And certainly, this Court can give precedent to authority of this Court when it's not inconsistent with the United States Supreme Court. And in this case, the way the State got the conviction, ultimately, was presenting Christina as a sexual innocent. I went over that at quite some length at pages 25 through 27 of the Blue Brief. Now that the cat's out of the bag with Carrie, we know she's not. But counsel could have proven that even with Chuck, had he been allowed to do so. And Judge Bea raised an interesting issue. Was this possibly even waived? Christina was the one who testified on direct and cross that her father confronted her about having sex with Chuck. Would that be a waiver? You know, again, candidly, I didn't argue that. Maybe I should have. But this is here before you on de novo review. Certainly, as I said before, as a result of the ruling, with that much of the cat out of the bag, they couldn't let the rest of the cat out of the bag. And it made my client look dislikable. It made him look like he was unfairly accusing his daughter of something he didn't do when the truth, which we're supposed to be searching for in these cases, is something different. Thank you very much. I really appreciate your questions. Frankly, I feel like I've gotten more due process today than I have in Nevada in the last 14 years, to be honest with you. Thank you very much. The case approved versus Crawford will be submitted. And we thank counsel for their excellent argument.
judges: Wallace, Nelson, Bea